# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

IMC KALIUM CARLSBAD, INC.,

      Plaintiff,

vs.                         No. CIV 97-1524 JC/RLP

BRUCE BABBITT, Secretary of the Interior;
INTERIOR BOARD OF LAND APPEALS;
the BUREAU OF LAND MANAGEMENT;
YATES PETROLEUM CORPORATION;
and POGO PRODUCING COMPANY,

      Defendants.

## OPINION AND ORDER

IMC Kalium Carlsbad, Inc., appeals a decision by the Interior Board of Land Appeals

("IBLA") directing the Bureau of Land Management ("BLM") to issue a potassium lease to Pogo

Producing Company and Yates Petroleum Corporation. *See Pogo Producing Co.*, 138 I.B.L.A. 142

(1997), *recons. denied*, IBLA Order 93-246R (Sept. 22, 1997). Defendants Yates and Pogo were

the high bidders when BLM offered the lease for competitive bids on August 20, 1992, but the BLM

rejected their bid. BLM stated that it was rejecting the bid on the grounds that the bid was made in

bad faith, that accepting the bid would not be in the best interest of recovery of the potassium, and

that Yates' and Pogo's mining plan "could pose an undue economic hardship on the potash industry."

*BLM Letter Decision of Jan. 3, 1993* (Admin. Rec., Lease Case File at B24[1]). The IBLA reversed

---

[1] The Administrative Record in this case consists of four folders, designated Lease Case File, Official File, Reconsideration File, and Supplemental Record. The Lease Case File includes documents considered by BLM in its decision to reject the Yates/Pogo bid. The Official File includes additional documents that were filed in the appeal by Yates and Pogo to the IBLA. The Reconsideration File includes additional exhibits considered by the IBLA in arriving

the BLM decision on the grounds that the record did not provide a rational basis for BLM to reject Defendants' bid.  *See Pogo Producing Co.*, 138 I.B.L.A. at 158.  I find, to the contrary, that BLM properly concluded from the record that Yates and Pogo were motivated to obtain the lease in order to *minimize* the extent of the potassium ore bodies in the region that might prevent oil and gas drilling permits from being granted to Yates and Pogo.  Because awarding a potassium lease to such a party would not be in the best interest of potassium recovery, the record provides a rational basis for BLM's rejection.

The potassium lease that is the subject of this suit involves the right to recover potash from 5,280 acres of federally-owned land in Eddy County, New Mexico.  By all accounts, the lease has marginal economic value and will not be developed for several years.  Yet, this lease has spawned nearly seven years of hotly contested litigation between the parties.  To understand this dispute, a brief overview of the longstanding conflict between potassium and oil and gas interests is necessary.

## I.    <u>Historical Background</u>

The land near the Eddy County and Lea County border due east of Carlsbad, New Mexico, is doubly blessed by being rich in two natural resources, potash and oil and gas.  The potash in this region may be mined by conventional underground mining techniques.  The oil and gas are located much further beneath the earth and may be extracted through wells drilled through the potash zones.  Potash mining requires years of lead time before production can begin.  Oil and gas wells can be

---

at its September decision to deny IMC's petition for reconsideration.  The Supplemental Record ("Admin. Supp.") includes documents supplied by Yates and Pogo to BLM in November, 1992.  The Lease Case File, Official File, and Reconsideration File each consist of two parts, labeled A and B.  The Supplemental Record is organized by exhibit numbers, from Ex. 1 to Ex. 15B.  Therefore, the designation "Lease Case File at B24" indicates a document that was in the administrative record considered by BLM, at page 24 in part B.

placed in production more quickly. The inherent conflict lies here: although it makes economic sense to extract oil and gas before the potash is mined, oil and gas drilling through potash *may* create safety hazards when the potash is eventually mined, *may* increase the costs required to mine the potash, and *may* reduce the ultimate amount of potash that is recovered if the potash is mined.[2] Potash interests wish to restrict or prevent oil and gas drilling near potash leases, while oil and gas interests seek drilling permits near potash leases.

In 1986, the Secretary of the Interior issued an order that limited oil and gas drilling within the Eddy and Lea County, New Mexico, potash area. *See Oil, Gas & Potash Leasing & Dev. Within the Designated Potash Area of Eddy & Lea Counties, N.M.,* 51 Fed. Reg. 39,425 (1986) ("1986 Order"). The 1986 Order provided that oil and gas drilling in the potash area would be allowed only if "the lessee establishes to the satisfaction of the . . . [BLM] that such drilling will not interfere with the mining and recovery of potash deposits, or the interest of the United States will best be served by permitting such drilling." *Id.* The 1986 Order provides further that: "No wells shall be drilled for oil or gas at a location which, in the opinion of the authorized officer, would result in undue waste of potash deposits or constitute a hazard to or unduly interfere with mining operations being conducted for the extraction of potash deposits." *Id.*

Defendants Yates and Pogo own three federal oil and gas leases that cover portions of the same area as the disputed potash lease. Yates holds oil and gas lease NM-65417, covering most of Section 11 of Township 22 South, Range 31 East, New Mexico Prime Meridian, and NM-65418,

---

[2] The administrative record indicates that Defendants Yates and Pogo dispute whether these concerns are valid. *See* Admin. Rec., Official Files, IBLA 93-246 at A30. Yates and Pogo claim that new drilling techniques can reduce the safety risks and prevent waste of potash. However, that dispute is not relevant to this case. At least for the present, the Department of the Interior and its agency, the BLM, have taken the position that potash reserves must be protected from the potential risks of oil and gas drilling in the Carlsbad potash area.

including a portion of Section 14 in the same township. Pogo holds oil and gas lease NM-62589, covering all of Section 23 in that township. Plaintiff IMC has substantial potash operations in the potash area.

During 1991, Pogo and Yates filed applications for permits to drill ("APDs") on their oil and gas leases. Pogo proposed to drill twelve wells in Section 23. Yates filed APDs for eight wells in Section 11 and one well in Section 14. The BLM denied the Yates and Pogo APDs in a series of decisions between January, 1992 and July, 1992. BLM's decision to deny the APDs was based on the belief that the wells were located in two potash ore zones[3] that could constitute a "potash enclave," and that drilling of the wells could lead to the waste of potash. Yates and Pogo appealed the denial of their APDs in 1992.

Meanwhile, on April 30, 1991 IMC requested that BLM offer potassium leases in this same area by competitive sale. BLM held a competitive sale of leases on two parcels of land on August 20, 1992 by oral auction. The first parcel offered at the sale, consisting of 640 acres, is not involved in this dispute. The second parcel, the subject of this suit, contains 5,280 acres of land, including all of Sections 11, 14, and 23.[4] Three bidders participated in the auction for parcel two: Randy Patterson

---

[3] A number of ore zones are located within the lease area. Four ore zones (the second, fourth, eighth, and tenth) have potentially mineable potash according to the bidding materials suppled by BLM. *See* Admin. Rec., Lease Case File at B87. Of these, the fourth and tenth ore zones contain the most potash, *see id.*, and appear to be the most promising zones for mining. *See also* Gary L. Hutchinson, *Summary of Activities*, Admin. Supp. Ex. 7 at 1-2 (fourth zone has economic potential, tenth zone is sub-economic, second and eighth zones uneconomic and of limited areal extent).

[4] The full legal description of parcel two is New Mexico Principal Meridian, Township 22 South, Range 31 East,
> section 3 south ½;
> section 4 south ½ ;
> section 5 north ½ of the south ½ and north ½ of the south ½ of the south ½;
> all of sections 8 to 11, inclusive;
> section 13 southwest ¼ and south ½ of the northwest ¼;
> section 14;

of Yates Petroleum, Gary Williams of IMC, and Richard Heinen of Western Ag-Minerals Co. (another potassium mining company). Yates and Pogo agreed prior to the sale that Patterson would bid for Yates and Pogo as a team and that any lease issued would be owned 50% by Yates and 50% by Pogo. Patterson's bid of $6 per acre was the high bid, with IMC dropping out of the bidding after offering $5.15 per acre.[5]

BLM rejected the Yates/Pogo bid on October 22, 1992. In its letter decision to Yates and Pogo, BLM Deputy State Director Reed Smith cited statements from Yates' and Pogo's consultant, George Warnock, and actions of the applicants from which he concluded that

> major [potash] deposits would not be mined if we issued the potash lease to the applicants. A duty exists on the part of the lessee to develop the minerals. The statement by Mr. Warnock on behalf of the applicants, prior to lease issuance, that the lessee does not intend to develop the deposit exhibits bad faith. The regulations in 43 C.F.R. 3594.1 require that mining operations shall be conducted in a manner to yield the ultimate maximum recovery of the mineral deposits. . . . Despite the applicants' interest in acquiring the lease, the applicants have expressed no desire to mine, joint venture or otherwise promote potash development. Therefore, we reject the applicants' bid under 43 C.F.R. 3535.6.

Yates and Pogo representatives met with BLM officials in November, 1992 and presented BLM with supplementary materials in an effort to persuade BLM that their bid was made in good faith. *See* Admin. Rec., Lease File at B28-35.[6] These materials included the notes and records of two

---

section 23;
section 24 northwest ¼; and
section 26 north ½ of the north ½.

[5] BLM's original minutes on the competitive lease sale indicated that IMC's final bid before dropping out of the auction was $5 per acre. All parties agree that this was incorrect and resulted from an error transcribing handwritten records of the bidding. Review of the handwritten notes from the auction reveal that Patterson bid $5 per acre for the Yates/Pogo team, IMC's Williams bid $5.15 per acre, and Patterson made the final bid of $6 per acre.

[6] The materials presented by Yates and Pogo to BLM on November 19, 1992 are included in the supplemental administrative record lodged with the Court on June 15, 1998.

consultants, Gary Hutchinson and Leo Lammers, as well as detailed maps of the area. Several of the documents that were provided to BLM, including memoranda by Hutchinson and Lammers, were created in November, 1992 after BLM had rejected the Yates/Pogo bid. Most of the other documents were prepared during the first two weeks of August, 1992. The supplemental materials clearly indicate that Yates and Pogo had mixed motives in bidding on the potash lease. For example, an August 12, 1992 memorandum from Gary Hutchinson to Randy Patterson, drafted after Hutchinson and Lammers met to review their data, states:

> I encourage you to continue to pursue approval to bid on the Potash Leases August 20.
>
> The root of Yates['] problem getting approvals for [oil and gas] drilling within the potash area is the BLM's outdated economic data, disinterest in commerciallity [sic] of potash, and mandate to protect potash mines. The economically troubled potash industry is, of course, prodding the BLM to 'do its job.'
>
> The outlines of known potash deposits that I showed you yesterday are much smaller than the BLM would show using their very low cut-off grades. However, if a reasonable mineral exploration company has the leases and drills some core holes for tonnage and grade information then performs feasibility studies using real world data, the BLM personnel [will be] disarmed with facts and science *thereby aiding Yates['] ability to obtain drilling approvals* cause [sic] *within the lease sale area.*
>
> *There must be an amount of investment that makes bidding on potash cost effective relative to legal action which at best will only cover up but not fix the drilling approval problem.*
>
> Western Ag made $5 million profit in '91 against a $27 million cost mining Langbeinite. '92 should be similar with '93 much better with new compaction equipment.

*See* Supp. Rec., Ex. 13 (emphasis added).

Yates characterized its motivation in somewhat different terms in a summary prepared *after* BLM rejected its bid:

Frustrated by the regulations that unilaterally allowed potash mining companies and BLM representatives to arbitrarily withdraw oil and gas exploration areas from use by the oil and gas lessees as well as the requirements that hold all potash exploration and mining information confidential, Yates and others embarked on a program to develop potash mining information from public sources. The knowledge developed from this program would allow Yates to make an independent determination as to whether oil and gas exploration could be safely and economically conducted in the same area as potash mining.

*See* Supp. Rec., Ex. 1 at 1.

The BLM considered the supplemental materials, but again rejected the Yates/Pogo bid on January 5, 1993. *See* Admin. Rec., Official File at A91. The BLM attempted to award the lease to IMC as the next highest bidder on January 7, 1993. *See* Admin. Rec., Lease Case File at B22.

Yates and Pogo appealed BLM's decisions to reject their bid and to award the lease to IMC on January 27, 1993.[7] The IBLA reversed BLM's rejection of the Yates and Pogo bid on February 10, 1997. *See Pogo Producing Co.*, 138 I.B.L.A. 142 (1997). IMC petitioned the IBLA to reconsider its decision and to examine evidence that Yates and Pogo were introducing in their APD appeals that allegedly proved that Yates and Pogo were planning to use their potassium lease to "leverage" their position in the APD process. *See* Admin. Rec., Reconsid. File at B68. The IBLA denied IMC's petition for reconsideration, stating the petition did not "present sufficient reason or

----

[7] Yates and Pogo also filed a complaint in this court to enjoin BLM from awarding the lease to IMC. *See* Docket Report, *Pogo Producing Co. v. Bureau of Land Management*, No. CIV 93-0213 JP/LFG (filed Feb. 22, 1993). The parties agreed to a stipulated settlement in that case on February 23, 1993, in which BLM agreed not to issue the lease until Yates and Pogo exhausted their administrative appeals. Due to some confusion, BLM issued the lease to IMC in direct violation of the stipulated order. Judge Parker subsequently issued a judgment requiring BLM to cancel the IMC lease and pay sanctions to Yates and Pogo.

Yates and Pogo also point out that BLM issued the lease to IMC at a price of $5.00 per acre instead of the $5.15 per acre that IMC bid. They claim that BLM's action of improperly issuing the lease to IMC before the IBLA appeals were exhausted, at a price less than IMC actually bid, is evidence of BLM's determination to award the lease to IMC. *See* Def. Yates' & Pogo's Answer Br. at 27. Careless agency practices that cause leases to be issued despite court orders to the contrary, and at prices less than actually bid, are troubling. However, these actions are not relevant to my review of the IBLA's decision.

extraordinary circumstances that warrant reconsideration of our decision." *See* IBLA Order 93-246R at 2 (Sept. 22, 1997).

## II.     <u>Standard of Review</u>

IMC brings this suit for judicial review of the IBLA's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  When reviewing an IBLA decision under the APA, the IBLA's decision shall be set aside only if it is found to be "arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence." *American Colloid Co. v. Babbitt*, 145 F.3d 1152, 1154 (10th Cir. 1998).  Decisions of the IBLA are entitled to deference, *see id.*, but a decision will be set aside if it lacks substantial factual support on the record or is the product of an arbitrary or capricious decision making process.  *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575-76 (10th Cir. 1994).  The duty of this court is "to ascertain whether the [IBLA] examined the relevant data and articulated a rational connection between the facts found and the decision made.  In reviewing the agency's explanation, [this] court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *Id.* at 1574 (footnote omitted) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)).

As the *Olenhouse* opinion points out, the "arbitrary and capricious" standard requires the reviewing court to look first to the reasons given by the agency for its actions.  *Olenhouse*, 42 F.3d at 1575.  "The agency must make plain its course of inquiry, its analysis and its reasoning." *Id.*  In addition, the agency's action must be supported by substantial evidence in the record. *Id.*  Therefore, I will consider the basis stated by the IBLA for its decision and then examine the record to determine

whether the IBLA considered all of the relevant factors, examined the relevant data, and articulated a rational connection between the facts found and the decision made.[8]

### III.    Basis for the IBLA's Decision

The IBLA considered two issues in arriving at its decision to reverse BLM's rejection of the Yates/Pogo bid. First, the IBLA considered whether BLM had discretionary authority to reject a high bid where the high bidder meets all of the qualifications established by statute or regulation. The IBLA concluded that BLM has discretionary authority under 30 U.S.C. § 283 and 43 C.F.R. § 3535.3-3(f) to reject any and all bids, including the bid of a qualified high bidder. *See Pogo Producing Co.*, 138 I.B.L.A. at 153. The scope of BLM's authority to reject bids is limited only by the requirement that "the record must disclose a rational basis for the rejection and must be sufficient to establish that the decision was not arbitrary, capricious, or in error." *Id.* at 154. This portion of the IBLA's decision is not in dispute.

Next, the IBLA addressed the issue of "whether the record reveals reasonable grounds for BLM's conclusion that appellants' high bid was made in bad faith and not in the best interest of recovery of the potassium resources and therefore should be rejected." *Id.* The IBLA looked to the reasons given by BLM for the rejection of the Yates/Pogo bid in its January 5, 1993 letter decision. *See id.* at 142. In that letter, BLM summarized its rationale as follows:

---

[8] Defendants Yates and Pogo point out in their answer brief that the IBLA is "the voice of the Secretary invested with *de novo* review to make the factual and legal determinations for the Department." Yates & Pogo Ans. Br. at 29-30 *(Doc. 18)*. I agree that IBLA could have conducted a *de novo* review, with a formal evidentiary hearing. However, IBLA did not choose this route, but instead based its decision on a review of whether the record provided BLM with a rational basis for rejecting the Yates/Pogo bid. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.

After consideration of the supplemental materials, we conclude that the bid was made in bad faith and not in the best interest of recovery of the potassium resources. Additionally, the proposed plan submitted could pose an undue economic hardship on the potash industry. Our conclusions are based on the applicants['] presentation of two conflicting mineral development scenarios, their attempt to acquire the potash lease to develop oil and gas, and their proposal for development in violation of the 1986 Secretary Potash Order.

*See* Admin. Rec., Lease Case File at B24.

The IBLA analyzed BLM's decision by identifying three grounds for BLM's rejection of the Yates/Pogo bid and disposing of each separately. The three grounds considered by IBLA were: (1) whether the Yates/Pogo bid was made in bad faith; (2) whether awarding the potash lease to Yates and Pogo was in the best interest of recovery of the potassium resources; and (3) whether the proposed plan for simultaneous development of potassium and oil and gas could pose an economic hardship for the potash industry.

### A. Bad Faith

IBLA summarized its understanding of the BLM's bad faith determination as follows:

The major underpinnings of BLM's bad faith determination consist of the perceived inconsistencies between the Warnock and Hutchinson evaluations of the economic potential of the potash ore zones within the lease area and appellants' numerous appeals of BLM denials of APD's for oil and gas wells within the designated Potash Area. We have carefully examined the supplemental materials provided by appellants documenting the genesis of their decision to bid. Although we find indications that appellants had more than one objective in bidding on the lease, we are not persuaded that they were proceeding in bad faith or with ulterior motives in offering their bid.

*Pogo Producing Co.*, 138 I.B.L.A. at 154.

The IBLA quoted Hutchinson's August 12, 1992 memorandum to Patterson (Admin. Supp. Ex. 13) as an example of Yates' and Pogo's multiple objectives, but did not discuss this memo or these multiple objectives in its opinion. The IBLA then went on to quote at length three sections of

the supplemental materials prepared by Yates and Pogo in November, 1992 and submitted to BLM in an attempt to convince the agency to reverse its rejection of their bid. These materials include Hutchinson's November 1, 1992 summary of his August 10 discussions with Leo Lammers. In that summary, Hutchinson stated that the fourth ore zone "shows a surprisingly high potential for commerciality" Admin. Rec., Supp. Ex. 7 at 2. The IBLA also quoted Hutchinson's conclusion, in the same November 1, 1992 summary, that "I'm confident that I can effect a positive outcome from the property for both oil production and potash production if the leases are eventually awarded to Yates and Pogo." *Id.* Ex. 7 at 3. The IBLA presented these materials as evidence that Yates and Pogo "undertook a serious examination of the possible commerciality of the deposits and concluded that the potential for an economic return from mining the potash ore warranted submitting the bid for tract No. 2."

The IBLA next considered BLM's claim that the inconsistent positions espoused by Yates and Pogo in submitting George Warnock's report in appealing the denial of their APDs, while simultaneously submitting Hutchinson's summary to BLM to obtain the potash lease, shows bad faith. *See Pogo Producing Co.*, 138 I.B.L.A. at 156. The IBLA found that the reports did not "demonstrate that [Yates and Pogo] espouse contradictory positions on the economic viability of the potash deposit depending on whether they seek APD approval or potash lease acquisition." The IBLA explained its reasoning as follows:

> Even if the studies did conflict, neither the fact that a later, more comprehensive evaluation specifically designed to evaluate the economic potential of potash lease procurement reached a somewhat different result than an earlier study prepared for a different purpose nor appellants' continued reliance on the earlier Warnock study as support for the issues it was commissioned to address, demonstrates bad faith. Rather, the two analyses conform to appellants' acknowledged goal of pursuing the profitable development of both oil and gas and potash.

*See id.* at 157.

These excerpts from the IBLA decision indicate that the IBLA equates "bad faith" with "ulterior motives," and that efforts by Yates and Pogo to bid on the potash lease in order to maximize their profits from oil and gas lease development do not constitute bad faith so long as Yates and Pogo *might* develop potash on a part of their lease. The IBLA did not find a conflict in Yates' and Pogo's use of the Warnock report to *minimize* the extent of the potash reserves when seeking APD approval, while using Hutchinson's November, 1992 memorandum to assert that Yates and Pogo might find the fourth ore zone economical to sublease to a potash firm after completing exploration. According to the IBLA,

> Appellants acknowledge that they seek to optimize oil and gas development on their oil and gas leases, but they also profess the desire to maximize the recovery of potash resources from the lease should it be awarded to them. While BLM finds the concurrent development of oil and gas incompatible with safe potash recovery, appellants disagree and actively pursue simultaneous development of those resources. Resolution of that disagreement, however, is not necessary to settle the issues raised in the present appeal since we find that appellants' expressed desire to produce both oil and gas and potash does not suffice to establish that appellants' bid was made in bad faith. BLM's speculation that appellants seek the potash lease in order to develop oil and gas resources not only lacks factual underpinnings, but also ignores the fact that a potassium lease grants the lessee the right to produce potash and associated minerals, not oil and gas.

*See id.*

**B.      Best Interest of Recovery of Potassium Resources**

BLM's January 5, 1993 decision rejecting the Yates/Pogo bid stated that the analysis presented by Gary Hutchinson "eliminates recovery of potash reserves in the Second and Tenth ore zones." Admin. Rec., Official File at A94. The tenth ore zone includes parts of sections 11, 14 and 23, i.e., the region where Yates' and Pogo's denied APD's are located. BLM pointed to its

obligation under Department of the Interior regulation 43 CFR 3594.1 to insure that potash mining

on federal leases yields the ultimate maximum recovery of potash. Because the tenth ore zone would

not be mined under Hutchinson's analysis, the BLM determined that leasing to Yates and Pogo would

not be in the best interest of ultimate maximum recovery of potash.

The IBLA rejected BLM's claim that award of the lease to Yates and Pogo would not be in

the best interest of potassium resources. The IBLA devoted only one paragraph of its opinion to this

issue. *See Pogo Producing Co.*, 138 I.B.L.A. at 157. According to the IBLA,

> The fact that Hutchinson's analysis identifies as uneconomic some potash ore zones
> BLM considers commercial does not mean that those zones will be wasted should
> appellants be awarded the lease. As mining progresses and initial costs are recouped,
> appellants will be in a better position to determine the economic viability of mining
> those zones.

*Id.* The IBLA also pointed out that Yates and Pogo were contemplating subleasing to a mining

company after Yates and Pogo had completed their exploration of the potash lease.

IBLA's decision on this issue appears to be based on the premise that the BLM cannot assume

that potash in the tenth ore zone will not be recovered based on the statements of Hutchinson and

other Yates and Pogo consultants that the potash is uneconomic. The IBLA decision does not

address BLM's concerns that the Yates/Pogo exploration and development plans for the potash lease

would result in the tenth ore zone being written off as uneconomic so that oil and gas wells could be

drilled.

**C.      Economic Hardship to Potassium Industry from
          Simultaneous Development of Resources**

BLM's expressed concern that simultaneous development of oil and gas and potash in the

lease area could lead to safety hazards caused by migration of gas or other petroleum products into

the potash deposits in the Carlsbad basin. According to the BLM, "[t]he added expense of equipment, ventilation, testing, and training would place an undue economic hardship on affected potash operations or force those operations to close." Admin. Rec., Official File at A94. IBLA rejected this reasoning, pointing out that BLM has the authority to disapprove APD's or potash mining plans that pose safety risks. *See Pogo Producing Co.*, 138 I.B.L.A. at 157-58.

## IV.    Examination of the Record

Both parties point to numerous documents in the administrative record to advance their arguments. However, my review of the IBLA decision under the standard of review stated in *Olenhouse* is whether the record supports the IBLA decision. *See Olenhouse*, 42 F.3d at 1575. Therefore, I need only examine evidence presented to the IBLA that could support BLM's asserted reasons for rejecting the Yates/Pogo bid, i.e, "that appellants' high bid was made in bad faith and not in the best interest of recovery of the potassium resources and therefore should be rejected." 138 I.B.L.A. at 154. As the IBLA points out in its opinion, BLM's rejection cannot be based on speculation or a subjective assessment of Yates' and Pogo's motives based on "appellants' status as oil and gas operators," *id.* at 157, but can only be based on "objective information . . . indicating that appellants believe that the potash in question is not worth developing and should be forfeited in favor of oil and gas development." *Id.* at 152.

My review of the administrative record, particularly BLM's January 5, 1993 letter decision, indicates that BLM pointed to four categories of evidence that supported its rejection:

1)      Yates' and Pogo's actions in pursuing the APD's that indicated they did not believe the potash in the lease area could be economically developed;

-14-

2)    Hutchinson's statements discounting the economic potential of the second and tenth ore zones that indicated those zones would not be mined;

3)    Statements made by Hutchinson that are inconsistent with statements made by Warnock and cast doubt on Yates' and Pogo's motives; and

4)    Yates' and Pogo's asserted intent to develop potassium and oil on the lease simultaneously in violation of BLM's position that such development would pose safety risks.

### A.    Yates' and Pogo's Actions in the APD Approval Process

Pogo submitted a Notice of Appeal and Statement of Reasons and Brief to the IBLA on September 17, 1992 in conjunction with its appeal of BLM's decision denying twelve APD's on Section 23.  *See* BLM Decision, Admin. Rec., Official File at A91.  Yates appealed denials of four APD's in Sections 11 and 14 on August 20, 1992, and appealed five other denied APD's in Section 11 on December 9, 1992.  *See id.* at A92.

In its Statement of Reasons and Brief, Pogo argued that the APD's should be granted in Section 23 because the potash deposits are not economic to produce.  *See id.* at A91.  Pogo submitted the report of its consultant, George Warnock, who analyzed "the WIPP area"[9] and concluded "the potash reserves underlying the WIPP Area will not be mined within the next 20 to 30 years, if ever.  Present economics do not justify the risk of capital for the marginal return on capital employed."  Warnock conducted his original study in February and March of 1992, before Hutchinson and Lammers conducted their study.  Nonetheless, Pogo resubmitted a modified affidavit of Warnock it in its APD appeal in September, 1992 as evidence that "The Potash Deposits Within

---

[9] Warnock defined "the WIPP area" as "Sections 3, 4, 5, 8, 9, 10, 11, 13, 14, 23, 24, and 26 in Township 22 South, Range 31 East."  *See* Admin. Rec., Lease Case File at B38.

the WIPP Area Should Not Be Defined As Economic Ore Reserves." *See* Admin. Rec., Official Files at A91; Exhibits 16 and 17 to Pl. Reply Br. Warnock's September affidavit comes to essentially the same conclusion as his March report: "If the WIPP Area were economic for production of potash--which it is not--it would still only be classified as indicated ore reserves over only part of the area." *See* Ex. 17 at 2.

###   B.     Second and Tenth Ore Zones

BLM's lease notice indicated that potash existed in four ore zones: 29 million tons in the 10th ore zone, 11 million tons in the 8th ore zone, 48 million tons in the 4th ore zone, and 8 million tons in the 2nd ore zone. *See* Admin. Rec., Lease Case File at B87. The fourth and tenth ore zones appear to be the most promising of these. The fourth ore zone is most promising because it contains potash as langbeinite, which commands a higher price because it can be used in some fertilizer applications where the cheaper Canadian potash is not suitable.[10] The tenth ore zone contains mixed sylvite and langbeinite ore, but it is mostly sylvite. The tenth zone is promising because the concentration of sylvite exceeds ten percent throughout much of the region and the average thickness of the ore body exceeds four feet.[11]

The record indicates that BLM based its assessment that potash existed in these four zones based on its classification criteria that potash ore exceeding 10% sylvite averaged over a minimum four foot thickness, or 4% langbeinite averaged over a four foot thickness, was potentially economic.

---

[10] Two types of potash ore are mined in the Carlsbad region. Langbeinite ore contains potassium magnesium sulfate, $K_2Mg_2(SO_4)_3$, while sylvite ore contains potassium chloride (also known as muriate of potassium), $KCl$. *See* WEBSTER'S 3D NEW INT'L DICTIONARY (1971). Canadian mines produce large quantities of sylvite, depressing prices for that fertilizer. *See* Admin. Rec., Lease Case File at B44-45. Langbeinite is suitable for certain sensitive crops. *See* Admin. Rec., Official File at A72.

[11] Four feet is the minimum mining thickness. Potash concentrations in ore bodies less than four feet thick would be diluted by mixing non-potash ore in with the potash ore during mining operations.

*See* Admin. Rec., Lease Case File at B87. Yates and Pogo disagree with BLM's criteria. *See* Admin. Rec., Official File at A122. Yates and Pogo believe that no zone other than the fourth zone could possibly contain commercial potash. *See, e.g., id.* (stating that the second and tenth zones "are not commercial and . . . will not be commercial under any rational scenario" and "the only potentially feasible deposit is the fourth zone").

The locations of the fourth and tenth ore zones are important in this dispute because the potentially commercial ore body of the fourth ore zone extends along the north border of the WIPP site, extending west from Sections 10 and 11. *See* Admin. Rec., Official File at A95. The fourth ore zone does not appear to contain potash in commercial concentrations under Sections 14 or 23. However, the tenth ore zone extends south through Sections 11, 14, and 23. *See id.* In other words, if the fourth ore zone contains potash in potentially commercial quantities but the tenth ore zone does not, then the appealed APD's in Section 23 would not intersect the potash region. Yates' APD's in Sections 11 and 14 might or might not intersect the region where the fourth zone contains potentially commercial potash, depending on the criteria used. Therefore, proving the tenth zone to be uneconomic and minimizing the extent of the fourth zone's potentially economic potash would be in the best interest of Yates' and Pogo's oil drilling interests.

Yates and Pogo submitted information to the BLM indicating that they believed only the fourth ore zone contained a potentially economic ore body, and that the ore body was much smaller than BLM indicated. *See* Admin. Supp., Ex. 4 at 5; Ex. 7 at 1-2; Ex. 13. Yates and Pogo also submitted a plan to drill ten core holes once the lease was obtained. *See id.* Ex. 4 at 5; Admin. Rec., Official File at A110. According to Gary Hutchinson, only one of the proposed core holes was to

be drilled to explore the tenth ore zone, and that core hole was selected to "unquestionably condemn the tenth zone."

### C. Hutchinson's Statements

The record indicates that Yates and Pogo hired three consultants (Leo Lammers, Gary Hutchinson and George Warnock) to examine the economics of potash production in the Carlsbad basin. The purpose of the potash project was to obtain information that could be used by Yates and Pogo in support of their APD's. *See* Admin. Supp. Ex. 1. Yates and Pogo sought to prove that BLM was using outdated and inaccurate economic data to define potash ore zones. *See* Admin. Supp. Ex. 13. If BLM could be persuaded to change its criteria for defining cut-off grades, then the outlines of potash ore zones would be much smaller, *see id.*, and Yates and Pogo would have a better chance of securing APD approvals. Gary Hutchinson believed that securing the potash lease on the subject tract could assist Yates to obtain drilling approvals. *See id.*

Hutchinson and Lammers reviewed potash information on August 11, 1992, and concluded that the second and tenth ore zones were uneconomic, but the fourth ore zone had economic potential, although covering a smaller area than the region identified by BLM. *See id.* Ex. 7 and 13. Hutchinson persuaded Randy Patterson and Yates management to make a bid on the potash lease in order to obtain core samples, stating that "There must be an amount of investment that makes bidding on potash cost effective relative to legal action which at best will only cover up but not fix the drilling approval problem." Admin. Supp. Ex. 13. The administrative record also includes detailed notes and copies of scheduling calendars from Yates' consultants. *See* Admin. Supp. Ex. 12-15. These records indicate that much of Hutchinson's and Lammers' efforts were devoted to the tenth ore zone. *See id.* Ex. 14A.

Summarizing the above, the administrative record shows more similarities than differences between Hutchinson's conclusions and Warnock's conclusions.  Both Hutchinson and Warnock assert, unequivocally, that no ore zones in the WIPP area have economic potential except possibly the fourth.  Hutchinson claims the fourth ore zone has promise, but is unproven, and its extent is more limited than BLM indicates.  Hutchinson's statements indicate that Yates' and Pogo's interest in the potash lease was primarily to obtain information that could be useful in obtaining approval of the APD's, but that Yates and Pogo could recover their costs of leasing and exploration by subleasing after they obtained the core samples.  *See* Admin. Supp. Ex. 7 at 2.

### D.      Simultaneous Potash and Oil and Gas Development

Yates' and Pogo's asserted motivation in investigating the potash lease was to determine whether oil and gas drilling could be "safely and economically conducted in the same area as potash mining."  Admin. Supp. Ex. 1.  In a November 19, 1992 letter requesting BLM reconsideration, Yates' attorney states that the bid was made "in good faith with every intention of allowing potash development to occur simultaneously with oil and gas development should the potash resources therein be determined to exist in economic quantities and quality."  Admin. Rec., Lease Case File at B33.  BLM pointed to that language as evidence of bad faith in that it proposes a development plan that disregards the 1986 Secretary's Order and could pose safety hazards.  *See* Admin. Rec., Official File at A93-94.  Both parties devoted considerable time discussing this safety hazard issue in the record, *see, e.g.,* Admin. Rec., Official File at A22-25, A77-78, A120-22, B131-32.  However, the only relevance this issue has to the current dispute centers on Yates' and Pogo's motives.  If the only way that Yates' and Pogo's positions in the APD approval appeal and the potash lease can be reconciled is through a development plan that is irrational, then BLM could properly question their

good faith. The record is ambiguous as to what Yates and Pogo meant by simultaneous development, but the record is clear on one point: Yates' and Pogo's first priority was to secure approval for oil and gas drilling permits by showing the potassium under Sections 11, 14 and 23 should not be defined as an economic ore body. *See* Admin. Rec., Official File at A113-14, A115-16. To the extent Yates and Pogo found potash under those sections, they would develop the potash after drilling the oil wells. *See id.* at A116.

## V.    Analysis

As a preliminary matter, I need to consider an issue that the IBLA did not address: whether the reason offered by the BLM for rejecting the Yates/Pogo bid would be sufficient if it were supported by evidence in the record. The IBLA omitted this step in its analysis, stating that "the record must disclose a rational basis for the rejection," but proceeding instead to the question of "whether the record reveals reasonable grounds for BLM's conclusion" that the Yates/Pogo bid was made in bad faith and not in the best interest of recovery of the potassium. *See Pogo Producing Co.*, 138 I.B.L.A. at 154. The question remains: does the BLM have sufficient reason to reject a bid if the record discloses that the bid was not made in the best interest of recovery of the potassium resources?[12]

The Department of the Interior and its constituent agencies derive their authority to lease federal lands for potassium exploration and development from the Potash Leasing Act of 1927 and

_____

[12] I note that this issue was raised and briefed by the parties in the IBLA appeal. *See* Statement of Reasons and Brief, Official File at A68-69; IMC Response, Official File at B135-137. By proceeding to the next step in its analysis without considering this issue, the IBLA opinion could be viewed as an implicit acknowledgment that BLM could reject the Yates/Pogo bid on this basis if there were evidence in the record to support it. However, the IBLA might have found it unnecessary to consider this issue. In any event, because Congress and the Department of the Interior have provided BLM with clear guidance and authority to reject a bid on this basis, there is no need to remand this case to the IBLA on this issue.

the Mineral Leasing Act of 1920, as amended.  *See* 30 U.S.C. §§ 181-287.  The purpose of the

Mineral Leasing Act was to encourage the development of mineral resources and to obtain for the

public a reasonable financial return on the mineral assets.  *See Harvey v. Udall*, 384 F.2d 883, 885

(10th Cir. 1967); *Mountain States Legal Found. v. Andrus,* 499 F. Supp. 383, 392 (D. Wyo. 1980)

(citing *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961)).  "The public does not benefit

from resources that remain undeveloped, and the Secretary must administer the Act so as to provide

some incentive for development."  *California Co.*, 296 F.2d at 388.  Congress reaffirmed these

policies in the Mining and Minerals Policy Act of 1970.  *See* 30 U.S.C. § 21a.  The Mining and

Minerals Policy Act provides the Department of the Interior with statutory authority to further

these policies.  *See id.*

The Department of the Interior has adopted regulations with the stated purpose "to encourage

maximum recovery and use of all known mineral resources."  *See* 43 C.F.R. § 3590.0-1.  For

example, 43 C.F.R. § 3594.1 requires that mining operations on leases "shall be conducted in a

manner to yield the ultimate maximum recovery of the mineral deposits" and shall protect "mineral

deposits that at a future date may be of economic importance."  Although these regulations strictly

apply only to the conduct of mining operations, they provide guidance to BLM, consistent with the

statutory policy statement, to exercise its authority to reject bids that do not further these goals.

The structure of the leasing and royalty scheme provides BLM with good reason to be

concerned about whether the lessee intends to develop the lease.  The record reveals the Yates/Pogo

bonus bid of $6 per acre, or $31,680 for the entire parcel, is dwarfed by the potential royalties of

several million dollars if even a small percentage of the estimated 98 million tons of potash ore is

eventually mined.  *See* Lease Case File at B87.  A potassium lease is renewable indefinitely so long

as the lessee makes minimal payments in lieu of royalties and complies with other lease terms. *See* 30 U.S.C. § 283. I conclude that BLM would have a legitimate basis to reject the Yates/Pogo bid if the record disclosed evidence from which BLM could conclude that Yates and Pogo did not intend to develop the potassium resources fully.

I turn now to whether the record supported BLM's conclusion. I am troubled by the IBLA's approach of analyzing each reason presented by BLM independently because it permits inconsistent positions to be presented. For example, IBLA claims that the Yates/Pogo bid was not in bad faith because Yates and Pogo actually intended to develop potassium on the lease simultaneously with oil and gas. However, when BLM raises safety concerns over the proposed simultaneous development of those resources, IBLA responds by pointing out that BLM will have the opportunity to raise this issue at a later date. Similarly, the IBLA states that potash will not necessarily be wasted because the tenth ore zone might be mined at some later date after Yates and Pogo have recovered their original cost from mining the fourth ore zone. Yet, in its bad faith analysis, IBLA does not consider the clear evidence of Yates' and Pogo's motivation to "unquestionably condemn" the tenth ore zone so that it can drill wells through that zone to be bad faith, because Yates and Pogo recognize the fourth ore zone contains potentially economic potash. I am convinced that these three issues (subjective motivation of the bidders, ultimate recovery of potash, and plausibility of the intended development) are interrelated. If the asserted motivation of the bidders would result in implausible development of potash or waste of the resource, BLM is justified in questioning whether the lease award would be in the best interest of potash recovery.

When this analytical impediment is removed, the record reveals that IBLA failed to consider the essential basis for BLM's rejection of the Yates/Pogo bid, focusing instead on tangential issues

raised by the language of the BLM decision. For example, I agree with IBLA that characterizing the Yates/Pogo bid as being made in "bad faith" is too strong if bad faith is equated with "ulterior motives." I also agree with the IBLA's conclusion that BLM has more direct means to address mine safety concerns through its authority to approve oil drilling and mining plans. But neither of these findings directly addresses BLM's concerns that awarding the lease to Yates and Pogo would not be in the best interest of potash recovery.

The record reveals that Yates and Pogo submitted their bid for the primary purpose of advancing their oil drilling interests. *See* Admin. Supp. at Ex. 13.[13] While this alone would not justify BLM in rejecting their bid, BLM also had evidence presented by Yates and Pogo themselves that it believed the tenth ore zone to be uneconomic, *see* Admin. Rec., Official File at A109-10, and the fourth ore zone to have some economic potential in the distant future, but in a much smaller area than BLM claimed, *see* Admin. Supp. at Ex. 13. BLM had evidence from which it could reasonably conclude that Yates and Pogo, if awarded the lease, would seek to drill core holes to minimize the extent of the tenth ore zone ("unquestionably condemn" in the words of Gary Hutchinson, *see* Official File at A110). BLM was concerned that such actions taken by Yates and Pogo as the potash lease holder to *minimize* the extent of the potash ore body in order to *maximize* the chances of securing APD approvals would be inconsistent with optimal potash recovery. *See* Admin. Rec., Official File at A10-11. If an APD were granted improvidently because the extent of the potash ore body was

---

[13] IBLA's statement that "BLM's speculation that appellants seek the potash lease in order to develop oil and gas resources not only lacks factual underpinnings, but also ignores that a potassium lease grants the lessee the right to produce potash and associated minerals, not oil and gas" is contrary to the record. Either IBLA misunderstood the issue or accepted the appellants' position, *see* Admin. Rec., Official File at A78, without critical analysis. The record shows that Yates and Pogo sought the potash lease to obtain information that could assist them in securing oil and gas APD approval. *See* Admin. Supp. at Ex. 13; Admin. Rec., Official File at A54, A111 and B136-37.

underestimated, then BLM was concerned that either potash would be wasted or potash mining would present safety risks. *See id.* at A11. This is the essence of BLM's reasons for rejecting the Yates/Pogo bid, yet the IBLA never addresses this issue. The record provides ample evidence to support BLM's conclusion that award of the lease to Yates and Pogo would not be in the best interest of potash recovery. The IBLA decision is not supported by the record and is therefore arbitrary and capricious.

## VI.    <u>Conclusion</u>

There is overwhelming evidence in the record that Yates and Pogo were pursuing the potash lease in order to *minimize* the area of known potash deposits and thereby "fix the drilling approval problem." It is undisputed that Yates and Pogo did not plan to develop the tenth ore zone and sought to prove that the tenth zone was uneconomic. There is overwhelming evidence that Yates and Pogo invested in the potash lease as an alternative to legal action to secure drilling permits, rather than for the purpose of mining potash. It is clear from the record that Yates and Pogo would develop the potash resources on the lease only if the Department of the Interior changed its policies to permit simultaneous development of both resources in the same area. Otherwise, Yates and Pogo would attempt to prove that the potash was not economical to mine.

In view of the magnitude of the evidence of Yates' and Pogo's motivation, BLM's decision to reject the Yates/Pogo bid had a rational basis. In the words of Gary Hutchinson, BLM was "doing its job" under the Mineral Leasing Act's mandate and the Department's own regulations to maximize the recovery of potassium. The BLM, viewing the Yates/Pogo bid in light of the existing 1986 Secretarial Order that restricted oil and gas drilling in potash regions, concluded that

-24-

Yates/Pogo's asserted desire to develop both resources simultaneously was not credible. In contrast, the IBLA engaged in pure speculation that Yates and Pogo could develop both resources simultaneously despite the 1986 Order, and that at some later date after Yates and Pogo recoup their mining costs they might even change their position and decide to mine the other ore zones.

Perhaps Yates and Pogo are correct that the Department of the Interior's policies protecting potash mines are unfair. Yates and Pogo may also be correct when they state that potash mining in much of the lease area is not economically practical based on BLM's cutoff criteria. They may even be correct when they state the current oil drilling technology can permit simultaneous development of oil and gas and potash without an undue safety risk or waste of potash. But none of these issues are relevant to this suit. Yates and Pogo should challenge these Department of the Interior policies directly instead of bidding on potash leases for the purpose of "disarming" BLM. When issuing potash leases, BLM is obligated to insure that the lease will maximize the recovery of potash without undue waste. BLM's rejection of the Yates/Pogo bid was consistent with that obligation and amply supported by facts in the record. Therefore, the IBLA's conclusion that BLM lacked a rational basis for rejecting the bid was arbitrary and capricious and should be reversed.[14]

Wherefore,

**IT IS ORDERED** that the February 10, 1997 decision of the Interior Board of Land Appeals in matter IBLA 93-246 shall be **reversed** and the case **remanded** to the Bureau of Land Management for further action consistent with this decision.

---

[14] Although neither party addressed this issue, a cursory perusal of 30 U.S.C. § 283 appears to indicate a statutory limit of 2,560 acres for competitive potassium leases. On remand, the BLM may wish to consider whether this limit has any application to the subject lease.

**IT IS FURTHER ORDERED** that the cross-claims of Defendant Yates Petroleum Corporation *(Doc. 4)* and Defendant Pogo Producing Company *(Doc. 5)* shall be **dismissed with prejudice**.

DATED this 12th day of January, 1999.

_John Edwards Conway_
**CHIEF UNITED STATES DISTRICT JUDGE**

Counsel for Plaintiff:

    Charles C. High, Jr.
    Kemp, Smith, Duncan & Hammond, P.C.
    El Paso, Texas

    James R. Bird
    Shea & Gardner
    Washington, D.C.

    A. Drew Hoffman
    Eastham Johnson Monnheimer & Jontz, P.C.
    Albuquerque, New Mexico

Counsel for Federal Defendants :

    John W. Zavitz, Assistant U. S. Attorney
    U. S. Attorney's Office
    District of New Mexico
    Albuquerque, New Mexico

Counsel for Defendant Yates Petroleum Corp.:

    Mary Lynn Bogle
    Losee, Carson, Haas & Carroll, P.A.
    Artesia, New Mexico

Counsel for Defendant Pogo Producing Co.:

    Gregory Nibert
    Hinkle, Cox, Eaton, Coffield & Hensley, LLP
    Roswell, New Mexico